IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

VALUTRON, N.V., et al.,          :

          Plaintiffs,            :

     vs.                         :     Case No. C-3-81-444

NCR CORPORATION,                 :     Judge Walter Herbert Rice

          Defendant.             :

----------------------------------------------------------------
FINDINGS OF FACT AND CONCLUSIONS OF LAW; OPINION;
JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND
AGAINST PLAINTIFFS; PLAINTIFFS' MOTION FOR EXPENSES,
PURSUANT TO FED. R. CIV. P. 37, MADE ORALLY DURING
TRIAL, OVERRULED; DEFENDANT'S REQUEST FOR ATTORNEY
FEES, PURSUANT TO 35 U.S.C. § 285, OVERRULED;
TERMINATION ENTRY
----------------------------------------------------------------

     This is a patent infringement action by Plaintiffs Valutron,

N.V., Arista, N.V., S. Prestley Blake, Lloyds Bank International

(Bahamas), Ltd. (as trustee for Bonnybrook Charitable Trust),

Cliff Resources Corporation (now known as Prospect Group, Inc.),

Federation of American Scientists Fund, Bernard Fisher, Casey

Fisher. David L. Hill, Louis Marx, Jr., Rodman G. Price, Noel

Fund, Inc., Sierra Ventures, Laura Rogal Olah (as administratrix

of the estate of Edward Rogal) and S. Fred Singer against

Defendant NCR Corporation. Specifically, Plaintiffs allege that

a point of sale system, known as the 280/725 system, manufactured

and marketed by NCR, infringes upon a valid patent of which

Plaintiffs are the current owners.

     The captioned cause was tried before this Court on

November 14-16, 1984, and on April 7-11 and 21-23, 1986. Prior

to and during trial in this matter, NCR asserted the equitable

#169

defense of laches. Based upon the evidence presented at the trial on the merits, this Court makes the following Findings of Fact and Conclusions of Law with respect to the laches issue.

## FINDINGS OF FACT

1. Plaintiff Valutron, N.V., is a Netherlands Antilles corporation whose main asset is United States Patent No. 3,121,159 (the Rogal patent). The corporate purpose of Valutron is the licensing and enforcement of the Rogal patent.

2. Plaintiffs Arista, N.V., S. Prestley Blake, Lloyds Bank International (Bahamas), Ltd. (as trustee for Bonnybrook Charitable Trust), Cliff Resources Corporation (now known as Prospect Group, Inc.), Federation of American Scientists Fund, Bernard Fisher, Casey Fisher, David L. Hill, Louis Marx, Jr., Rodman G. Price, Noel Fund, Inc., Sierra Ventures, Laura Rogal Olah (as administratrix of the estate of Edward Rogal) and S. Fred Singer each own an interest in the Rogal patent.

3. Plaintiffs' interest in the Rogal patent includes the right to sue for damages for its infringement. Plaintiffs agreed that Plaintiff Valutron and its President, Plaintiff Hill, would take the lead in this infringement action.

4. Defendant NCR Corporation is a Maryland corporation with its principal place of business in Dayton, Ohio. NCR is a leading manufacturer of retail store point of sale systems.

5. Edward Rogal, an inventor, filed an application for patent on January 5, 1959, for his "Central Office Massive Memory Recording System."

6. Patent No. 3,121,159 was issued to Universal Controls, Inc., Rogal's assignee, on February 11, 1964. The Rogal patent expired in 1981, prior to the commencement of this action.

7. Rogal's Central Office Massive Memory Recording System describes a point of sale system. A point of sale system is an electronic accounting system which instantaneously records, classifies and stores data relating to commercial transactions.

8. The basic elements of a point of sale system are transmitters (i.e., electronic cash registers) connected to a memory through a switching system.

9. In 1968, Rogal entered into a business relationship with Hill, the purpose of which was to manufacture and market a retail point of sale system.

10. Rogal and Hill formed a corporation known as Integrated Total Systems, Inc. (ITS). The Rogal patent was assigned to ITS. Funding for ITS was intended to be accomplished, at least in part, through Hill's company, Nanosecond Systems.

11. The late 1960's and the early 1970's represented a "boom" era for the point of sale industry, with many large retail chains purchasing point of sale systems. The industry was highly competitive, with numerous companies vying for a share of the market.

12. By the end of 1970, Hill and Rogal had reason to believe that the Rogal patent was being infringed on a large scale. In particular, Hill and Rogal believed that systems marketed by Pitney Bowes and Singer infringed the Rogal patent.

13. Hill and Rogal made a conscious decision not to attempt to enforce the Rogal patent at that time. Rogal wanted to concentrate on ITS' attempts to enter the point of sale market. Hill deferred to Rogal's judgment.

14. Hill and Rogal made no attempt to learn if others in the point of sale industry might be infringing the Rogal patent.

15. NCR was an early entrant into the point of sale market and, by at least mid-1973, was considered the leader in the industry.

16. Among the retail point of sale products developed by NCR in this time period was the 280 system. The 280 system was introduced to the market in 1970, and the first commercial sale of the system took place in 1971.

17. The specific product which formed the basis for this suit is the NCR 280/725 system. The 280/725 system was introduced to the market in 1973.

18. Rogal died in April, 1974. Rogal and Hill never produced a commercial point of sale product, and it is unclear whether a model or prototype was ever built.

19. After Rogal's death, ITS abandoned attempts to develop a commercial point of sale system. Hill, instead, set out to license and to enforce the Rogal patent.

20. Valutron was formed by Hill after Rogal's death to carry out the systematic licensing and enforcement of the Rogal patent. ITS assigned most of its interest in the Rogal patent to Valutron.

21. By late 1974, Hill suspected that NCR was among those infringing the Rogal patent. Hill was specifically aware of the 280/725 system at that time.

22. Hill was aware that a great deal of capital would be needed to enforce the Rogal patent. Hill raised funds by having Valutron sell interests in the Rogal patent. Valutron began selling participation interests in 1974, and began selling ownership interests in the Rogal patent in 1977.

23. The price for a 1% interest was approximately $30,000 in 1974, and rose steadily until it reached $150,000 per 1% interest.

24. Hill testified that he believed that $500,000 would be necessary in order to commence licensing and enforcement activity.

25. By 1976, Hill had received investments of approximately $65,000. Additional investments were received in the amounts of $70,000 in 1977, $45,000 in 1978 and $45,000 in 1979. Despite having raised approximately $225,000 by 1979, and $345,000 by 1980, Hill did not believe that he had sufficient funds to initiate legal action against any alleged infringer.

26. By the time of trial, Valutron had obtained funding in the approximate amount of $4,500,000.

27. Under the agreements reached between Valutron and the other owners, Valutron bears the cost of litigation relating to the enforcement of the Rogal patent. However, even in the event that Valutron is unsuccessful, it retains all excess funds.

Investments over and above the costs of licensing and enforcement proceedings will not be returned to the investors.

28. On April 12, 1978, despite the fact that the requisite $500,000 had not been raised, Valutron wrote to NCR accusing NCR of infringing the Rogal patent.[1] Although Hill testified that he did not believe that he was financially prepared to enter litigation at this stage, he was aware that his letter to NCR might provoke a declaratory judgment action, whereby NCR might file a lawsuit seeking a declaration of non-infringement from the court.

29. The letter did not identify the allegedly infringing NCR product, nor did it offer any detail as to the substance of the purported infringement.

30. The letter indicated Valutron's willingness to negotiate a license, and requested a response within two weeks. When no reply was forthcoming from NCR, Valutron sent a follow-up letter on May 12, 1978.

31. NCR responded by letter on May 31, 1978, indicating that it had ordered the file wrapper and contents of the Rogal patent from the Patent Office. NCR's patent counsel promised to look into the matter.

---

[1]Hill actually began communications with NCR in his capacity as President of Southport Computers, then an assignee of the Rogal patent from ITS. Southport took the lead in licensing activity until the formation of Valutron in June, 1980. However, since Hill was the primary actor for both Southport and Valutron and acted on behalf of all owners of the Rogal patent, this Court will, for the sake of clarity, refer to communications from Southport as communications from Hill and/or from Valutron.

32. NCR further requested that Valutron identify the specific point of sale system or systems which were deemed to infringe, and provide an element by element reading of the relevant claims of the Rogal patent on the allegedly infringing system or systems.

33. Valutron did not respond until January 22, 1979, on which date it wrote to NCR indicating that the infringing product was the "NCR 280 Retail System employing the NCR 725."

34. The next communication took place on February 22, 1980, when Valutron provided NCR with an element by element reading of Claim 1 of the Rogal patent on the 280/725 system. Valutron asserted that other claims could be read on the 280/725 system, as well as on other NCR products.

35. On June 23, 1980, NCR wrote to Valutron indicating that it questioned the validity of the Rogal patent and declined to consider a license.

36. At no time, prior to the initiation of litigation, was there an objective possibility that a licensing agreement could be reached between NCR and Valutron prior to the initiation of legal proceedings, nor did Hill subjectively harbor such a belief.

37. Valutron did not file suit against NCR until August 26, 1981.

## OPINION

NCR has raised the doctrine of laches as a defense to Valutron's claim of patent infringement. Unlike typical statutes

of limitation, the statute of limitations for patent suits, 35
U.S.C. § 286, is not a bar to maintaining an infringement action.
Rather, § 286 provides that "no recovery shall be had for any
infringement committed more than six years prior to the filing of
the complaint." Laches, on the other hand, may serve to
completely bar recovery prior to the date that suit is actually
filed. If a lawsuit is filed after the seventeen (17) year
period of the patent has expired (the situation in this case),
laches may serve as a complete bar to any recovery.

Although not specifically set forth by statute, courts have
long recognized the equitable defense of laches in patent
infringement actions. "In a legal context, laches may be defined
as the neglect or delay in bringing suit to remedy an alleged
wrong, which taken together with lapse of time and other
circumstances, causes prejudice to the adverse party and operates
as an equitable bar." A.C. Aukerman Co. v. R.L. Chaides Constr.
Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992). In Aukerman, the
United States Court of Appeals for the Federal Circuit reaffirmed
the existence of the laches defense in patent suits, noting that
"[c]ourts of equity, it has often been said, will not assist one
who has slept upon his rights, and shows no excuse for his laches
in not asserting them." 960 F.2d at 1029, quoting Lane & Bodley
Co. v. Locke, 150 U.S. 193, 201 (1893).

As a general rule, laches bars only recovery for damages
incurred prior to suit; a dilatory plaintiff may still seek post-
filing damages or injunctive relief. Aukerman, 960 F.2d at 1040-
41. In this case, however, Valutron's patent expired in

February, 1981, prior to the commencement of this action. Valutron concedes that its remedy, if it has one at all, is limited to damages incurred prior to the expiration of the Rogal patent. Therefore, if the doctrine of laches applies, Valutron will be effectively barred from any recovery.

The defense of laches is "personal to the particular party" and, therefore, "must have flexibility in its application." Aukerman, 960 F.2d at 1032. "A court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties." Id. To invoke the defense of laches, a defendant must demonstrate that (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant. Id.

Although the length of delay required for laches to attach is "personal to the particular party" and, therefore, incapable of mechanical application, "[l]aches is presumed in patent infringement cases if the delay is longer than six years." Meyers v. Brooks Shoe, 912 F.2d 1459, 1461 (Fed. Cir. 1990). This presumption of laches was reaffirmed in Aukerman, 960 F.2d at 1034-35. The Aukerman court "emphasized that the establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not mandate recognition of a laches defense in every case. Id. at 1036 (emphasis in original). The court also "reiterate[d] that, at

all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches." Id. at 1038.

As suggested by the above test, the first step in evaluating a laches defense is the determination of when the laches period began to run; i.e., when the plaintiff knew or should have known of its claim against the defendant. Valutron argues that, construing the facts most strongly in NCR's favor, the "laches clock" began to run in January, 1975, the month in which Hill obtained NCR manuals which provided actual notice of possible infringement of the Rogal patent by NCR. That date, however, while not an unreasonable estimation of the beginning of the laches period, is actually the latest that Valutron knew or should have known of NCR's alleged infringement and, therefore, actually represents the date most favorable to Valutron, not NCR.[2]

Valutron admits that it was aware of substantial infringement as early as 1970.[3] At this point, Hill and Rogal were particularly concerned that point of sale systems manufactured by Pitney Bowes and Singer infringed the Rogal patent. A patentee is "under an obligation to make a diligent

---

[2]Once again, this Court makes reference to Valutron for the sake of clarity, despite the fact that Valutron did not come into being until June, 1980. Actions of Hill, Rogal and/or Southport are attributable to Valutron, since successors in interest are charged with the knowledge and dilatory conduct of their predecessors. MGA v. Centri-Spray Corp., 639 F. Supp. 1238, 1242 (E.D. Mich. 1986). Valutron does not argue to the contrary.

[3]Exhibit C7, a document prepared by Hill for potential investors, states that substantial infringement became apparent "following 1970." Exhibit C12, a similar document, indicates that infringement began in June, 1970.

inquiry into any factual circumstances that might reasonably suggest the possibility of infringement." Soot v. General Elec. Co., 681 F. Supp. 157, 164 (S.D.N.Y. 1987). Despite this obligation, Hill and Rogal chose to focus their energies on their attempts to create their own commercial point of sale system. In other words, a business decision was made not to pursue licensing and enforcement, notwithstanding the fact that there was reason to believe that certain retail point of sale systems already on the market infringed the Rogal patent.

NCR entered the point of sale market in 1970 with the 280 system, and made its first commercial sale in 1971. In 1973, NCR introduced the 280/725 system. By this time, NCR had established itself not only as a market participant, but as the leader in the field. In a memorandum to owners of and participants in the Rogal patent, dated May 4, 1981, Hill estimated that NCR had sales, through February, 1981, of two billion dollars, corresponding to forty percent of the total point of sale market. However, Hill claims that he had no knowledge that NCR was involved in the manufacture of point of sale systems until late 1974, at which point he set out to obtain some NCR manuals on the 280/725 system.

While Hill may well have been ignorant of NCR's role in the point of sale field, that ignorance is hardly excusable. From 1970, when infringement by at least some market participants became apparent, until Rogal's death in April, 1974, Hill made a conscious decision to remain ignorant of other possible infringing systems. NCR was making no secret of its success in

the point of sale industry, and Hill, with minimal effort, surely could have discovered the overwhelming leader in a field which he, himself, was attempting to enter. Therefore, Hill's investigation of NCR should have been initiated well before late 1974.

Hill and Rogal chose, instead, to concentrate on their own efforts to produce a commercial point of sale system. Regardless of whether this was a sound business decision, it was one made with full knowledge that substantial infringement of the Rogal patent might be taking place. Moreover, although Hill testified that he and Rogal suspected only Pitney Bowes and Singer, this Court notes that, by late 1974, Hill was also investigating other point of sale producers, including IBM, another "giant" in the industry. Therefore, at some point between 1970 and 1974, Hill and/or Rogal must have deduced that the possible infringement was industry-wide, and not limited to two discrete manufacturers.

Accordingly, this Court finds that mid-1973, after sales of the NCR 280/725 had begun, is the point when Valutron knew or with reasonable diligence should have known of possible infringement by NCR. See, e.g., Soot, 681 F. Supp. at 166 (plaintiff had the "means of knowledge" whereby, with reasonable diligence, he could have discovered the factual basis for his claims); Motorola v. CBS, 672 F. Supp. 1033, 1039 (N.D. Ill. 1986) (means of knowledge are generally equivalent to actual knowledge).

Valutron argues strenuously that Hill did not sleep on his rights but, rather, launched an investigation which involved

countless hours in the Patent Office and consultations with two major patent law firms and stretched over a period of several years, in an attempt to learn if the Rogal patent was, indeed, being infringed by NCR or others. This Court agrees that, at least after the latter part of 1974, Hill did take steps to protect his rights, and this Court further understands that Hill did not have sufficient knowledge in late 1974 or early 1975 upon which to file an infringement action. This Court does not hold that Valutron should have filed suit in mid-1973, but only that suit should have been filed within six years of that time. Accord Motorola, 672 F. Supp. at 1039.

Valutron filed this action in August, 1981, approximately eight years after the laches period began to run. As Valutron acknowledges, even if the time is calculated from January, 1975, the time when Hill obtained the NCR manuals which provided actual notice of possible infringement, over six years passed before suit was filed. Therefore, NCR has successfully set forth at least a presumption of unreasonable delay and material prejudice, thus shifting the burden of production (but not the burden of persuasion) to Valutron to rebut this presumption. "Such evidence may be directed to showing either that the patentee's delay was reasonable or that the defendant suffered no prejudice or both." Aukerman, 960 F.2d at 1038.

Valutron's primary argument to rebut the presumption of laches is its assertion that Hill was engaged in negotiations with NCR from April, 1978, through June, 1980, and that such interval should not be included in the laches period. As a

general rule, license negotiations may toll the running of the laches period. However, "the negotiations must ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays." A.C. Aukerman Co. v. Miller Formless Co., 693 F.2d 697, 700 (7th Cir. 1982). See also Motorola, 672 F. Supp. at 1036-37; MGA v. Centri-Spray Corp., 639 F. Supp. 1238, 1243 (E.D. Mich. 1986).

In this case, Hill wrote to NCR on April 12, 1978, indicating that he believed "that a large volume of point-of-sale systems which have been manufactured and sold by NCR Corporation has infringed one or more of Claims 1, 2, 3, 4 and 11 of the [Rogal] Patent." Hill did not specify which NCR system or systems to which he referred, nor did he explain the basis for his belief. Hill stated that he would be "glad to arrange with [NCR] an appropriate license." However, Hill's letter, which was virtually identical to the letters Hill sent to over twenty-five other companies between 1978 and 1981, contained no specific terms and represented, at best, an offer to open negotiations. MGA, 639 F. Supp. at 1243.

NCR did not respond to Hill's initial letter. Hill again wrote to NCR on May 12, 1978, requesting a response. NCR wrote to Hill on May 31, 1978, stating that it had ordered the file wrapper and contents of the Rogal patent from the Patent Office, and that it would advise Hill of the results of its findings. NCR requested that Hill specify which NCR system or systems was deemed to infringe and provide an element by element reading of the relevant claims of the Rogal patent on such system or

systems. NCR expressed no interest in opening license
negotiations at that point in time.

Hill did not respond until January 22, 1979, when he
informed NCR that he believed that the NCR 280/725 system
infringed the Rogal patent. Hill further indicated that he was
reviewing recent NCR equipment and that a revised summary would
be forthcoming. However, there was no further communication
between the parties for over one year, until Hill wrote to NCR on
February 22, 1980, providing an element by element reading of
Claim 1 of the Rogal patent on the 280/725 system. Hill asserted
that certain other claims of the Rogal patent could be read on
the 280/725 and other unspecified NCR systems. On June 23, 1980,
NCR wrote to Hill expressing doubts as to the validity of the
Rogal patent and declining to take a license thereunder.

Despite Valutron's claim that it was hopeful of negotiating
a license with NCR, by no objective standard could this series of
communications be deemed anything other than "sporadic,
unfruitful, and one-sided, with little chance of success."
Motorola, 672 F. Supp. at 1037. NCR never expressed any interest
in taking a license, the parties never met face to face or spoke
by telephone, no terms were ever discussed, and the
communications were marked by one hiatus of eight months and
another of thirteen months.

Moreover, the record does not reflect any genuine belief,
reasonable or otherwise, on Hill's part that negotiations were
taking place. At trial, Hill testified that "we were hopeful of
negotiations with NCR, but we didn't have responses of a nature

from NCR that opened the door for negotiations." Tr. at 389. Similarly, in Exhibit C3, a memorandum from Hill to owners of and participants in the Rogal patent, dated May 4, 1981, Hill identified IBM, NCR and Singer as the major infringers. Hill informed the investors that "our experience with the firms which are making large use of the Patent indicates that their liability is so large that meaningful negotiations toward settlement seem unlikely until enforcement proceedings are well under way and trial is approaching in the Federal Courts." Accordingly, this Court must conclude that there were no license negotiations between Valutron and NCR of a nature which might even arguably excuse Valutron's delay in filing suit.

Valutron also attempts to justify the lengthy delay by arguing that it could not initiate licensing and enforcement proceedings without sufficient funding. This argument fails both factually and legally. As a general rule, a lack of funds does not excuse a delay in bringing suit. Naxon Telesign Corp. v. Bunker Ramo Corp., 686 F.2d 1258 (7th Cir. 1982); MGA, 639 F. Supp. at 1242.

Nor does the evidence in this case support Valutron's claim of pecuniary hardship. Although Hill testified that he needed $500,000 before he could institute legal proceedings, the basis for that belief was never set forth. Indeed, Hill began threatening companies with enforcement procedures in 1978, at which time only $180,000 had been raised. Hill testified that he was fully aware that his actions could have led to a declaratory judgment action being filed by one or more of the alleged

infringers and, therefore, was apparently of the belief that he could at least afford to begin litigation with less than $500,000.

Valutron received an additional $45,000 in 1979, and $120,000 in 1980. While Hill still hadn't reached the "magic number" of $500,000, he had amassed a sizeable sum. Moreover, Hill had been receiving funding steadily since 1976 and, armed with an opinion of counsel from a leading patent law firm suggesting that Valutron had a viable claim against NCR and Singer, had no reason to believe that continued investments would not be forthcoming. Therefore, this Court cannot accept Valutron's argument that lack of funds justifiably excused its dilatory conduct.[4]

Finally, Valutron attempts to rebut the presumption of prejudice to NCR by pointing out that NCR ceased production of the 280/725 in 1978. According to Valutron's argument, NCR could not have been prejudiced by the delay in filing suit since it did not continue or expand its infringing business after 1978. While this argument has some superficial appeal, it does not survive close examination.

First, although the case at bar deals with the narrow question of whether the 280/725 system infringes the Rogal patent, Valutron has never so limited its allegations. In his February 22, 1980, letter to NCR, Hill asserted that certain

---

[4]In addition, this Court notes that Valutron, if it was serious in its intent to enforce the Rogal patent, should have been arming its war chest since 1970, when substantial infringement became apparent.

claims of the Rogal patent could be read on NCR systems <u>other</u> <u>than the 280/725</u>. Valutron candidly admits that "[w]hether or not, during the infringement period, NCR also infringed by manufacturing, using or selling other systems within the scope of the claims in suit is reserved for an accounting proceeding to follow." <u>See</u> Valutron's Post-Trial Brief (Doc. #104) at 2. Therefore, it is far from clear that the discontinuation of the 280/725 system acted to limit NCR's potential liability.

Second, the 280/725 system was replaced by a "follow-on" point of sale system. The replacement of an infringing product with a new product will serve to cut off liability based on the earlier product <u>if</u> the new product differs significantly from the original product. If the replacement product is substantially similar to the old product, liability continues. <u>See</u>, <u>e.g.</u>, <u>Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.</u>, 708 F. Supp. 1423, 1435-37 (D. Del. 1989). In other words, if the follow-on point of sale system is substantially similar to the 280/725 system, NCR's potential liability did not cease in 1978, when the 280/725 system was discontinued.

The parties agree that the record simply does not reflect whether the follow-on system is substantially similar to the 280/725 system and, therefore, represents a continuation or expansion of NCR's point of sale business. They disagree, however, on which party suffers from this dearth of evidence.

On this issue, NCR has the better argument. Since Valutron unjustifiably delayed the commencement of this action for over six years from the time that it knew or should have known of

NCR's possible infringement, a presumption of prejudice was raised. Although NCR maintains at all times the ultimate burden of persuasion on its laches defense, the presumption of prejudice shifts the burden of production to Valutron to "offer proof directed to rebutting the laches factors." Aukerman, 960 F.2d at 1038. Therefore, NCR enjoys a presumption of prejudice until Valutron affirmatively demonstrates a lack of prejudice. Since Valutron has not shown the discontinuation of the 280/725 system to have cut off NCR's potential liability, the presumption has not been rebutted.

In conclusion, the record indisputably shows that, even construing the facts most favorably to Valutron, this action was commenced more than six years after Valutron knew or should have known of possible infringement by NCR, raising a presumption both of unreasonable delay and of material prejudice. Valutron has failed either to justify its delay or to demonstrate that NCR was not prejudiced by the delay. Accordingly, this Court finds that, upon weighing the equities of the parties, Valutron's claims are barred by the doctrine of laches.

Each side seeks to shift partially the cost of trial to the opposing party. At trial, Valutron made a Motion for Expenses, pursuant to Fed. R. Civ. P. 37, for NCR's failure to admit infringement prior to trial. NCR seeks to recover its attorney fees, pursuant to 35 U.S.C. § 285, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing parties." NCR argues that this is an exceptional case, since Valutron did not have an expert qualified to compare

the structure of the 280/725 system with the structure of the
system described by the Rogal patent and to render an opinion
regarding equivalence (Doc. #106 at 81-84).

Since this Court has found that Plaintiffs' claims are
barred by the doctrine of laches, it reaches neither the question
of the validity of the Rogal patent nor the issue of infringement
by NCR. Moreover, Plaintiffs' arguments against the application
of laches were neither frivolous nor made in bad faith.
Accordingly, this Court finds that Valutron's Motion for Expenses
and NCR's Request for Attorney Fees are not well taken.

## CONCLUSIONS OF LAW

1. Laches is the neglect or delay in bringing suit to remedy
an alleged wrong which, taken together with the lapse of time and
other circumstances, causes prejudice to the adverse party and
operates as an equitable bar.

2. The defense of laches is recognized in actions for patent
infringement.

3. A laches defense, when applicable, bars recovery only for
damages incurred prior to suit; a dilatory plaintiff may still
seek post-filing damages and/or injunctive relief.

4. For the reasons set forth above, Valutron has no claim to
post-filing damages or injunctive relief. Accordingly, the
application of laches serves to bar all recovery.

5. The defense of laches is personal to the particular party
and must have flexibility in its application. A court must look

at all of the facts and circumstances and weigh the equities of the parties.

6. To invoke the defense of laches, a defendant must demonstrate that (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant.

7. Laches is presumed in patent cases if the delay is longer than six years.

8. The presumption of laches shifts the burden of production to the plaintiff; however, the ultimate burden of persuasion remains at all times with the defendant.

9. A patentee is under an obligation to make a diligent inquiry into any factual circumstances that might reasonably suggest the possibility of infringement.

10. Successors in interest are charged with the knowledge and dilatory conduct of their predecessors.

11. Means of knowledge, whereby, with reasonable diligence a plaintiff could have discovered the factual basis for his claim of infringement, are equivalent to actual knowledge.

12. For the reasons set forth above, Valutron knew or reasonably should have known of NCR's possible infringement in mid-1973.

13. Since, even construing the facts most favorably toward Valutron, this action was commenced over six years from the time

that Valutron knew or reasonably should have known of NCR's possible infringement, laches is presumed.

14. License negotiations may toll the laches period when such negotiations are continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays.

15. For the reasons set forth above, the "negotiations" between Valutron and NCR were sporadic, unfruitful and one-sided, with little chance of success and, therefore, insufficient to toll the laches period.

16. As a general rule, lack of funds will not excuse delay in bringing suit.

17. For the reasons set forth above, Valutron has not demonstrated that the "laches clock" should be tolled by its lack of funds.

18. The discontinuation of an infringing product cuts off liability and, thus, rebuts a presumption of prejudice only if the discontinued product is not replaced by a substantially similar product.

19. For the reasons set forth above, Valutron has not rebutted the presumption of material prejudice to NCR occasioned by Valutron's unjustified delay in bringing suit.

20. For the reasons set forth above, NCR has established a defense of laches by a preponderance of the evidence.

21. Plaintiffs are not entitled to an award of expenses, pursuant to Fed. R. Civ. P. 37.

22. NCR is not entitled to an award of attorney fees, pursuant to 35 U.S.C. § 285.

Wherefore, based upon the above, judgment will be entered in favor of Defendant and against Plaintiffs. Plaintiffs' Motion for Expenses, pursuant to Fed. R. Civ. P. 37, made orally during trial, is overruled. NCR's Request for Attorney Fees, pursuant to 35 U.S.C. § 285, is overruled.

The captioned cause is hereby terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

August 18, 1992

**WALTER HERBERT RICE**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Howard P. Krisher, Esq.
Frank F. Scheck, Esq.
Armistead W. Gilliam, Esq.
Arthur I. Neustadt, Esq.
Robert L. Clark, Esq.